815 So.2d 1246 (2002)
Willie GRIFFIN, Appellant,
v.
DELTA DEMOCRAT TIMES PUBLISHING COMPANY, Dan Way, Individually, and Rick Thomason, Individually, Appellees.
No. 2000-CA-02067-COA.
Court of Appeals of Mississippi.
April 23, 2002.
*1247 Charles Victor McTeer, Jackson, Rayford G. Chambers, Greenville, attorneys for appellant.
Lawrence D. Wade, Greenville, John A. Bussian, Raleigh, NC, attorneys for appellee.
Before SOUTHWICK, P.J., LEE, and CHANDLER, JJ.
LEE, J., for the court.
¶ 1. Willie Griffin filed a complaint asserting libel against the Delta Democrat Times Publishing Company, Dan Way, individually, and Rick Thomason, individually. Thereafter, Griffin attempted to conduct discovery with the Delta Democrat Times Publishing Company, Dan Way, individually, and Rick Thomason, individually. However, the Delta Democrat Times Publishing Company, Dan Way, and Rick Thomason refused to answer discovery and instead responded to Griffin's requests for discovery by filing a motion for summary judgment, as well as a motion to stay discovery. The trial court failed to directly address the issue of discovery in his order, but granted the motion for summary judgment. Feeling aggrieved, Griffin filed a timely appeal and presents the following issues: (1) whether the trial judge erred when he classified Griffin as a public official for the purpose of his burden of proof regarding his libel claim and (2) whether the trial judge erred when he granted the motion for summary judgment without Griffin having the benefit of discovery regarding the Delta Democrat Times Publishing Company, Dan Way, and Rick Thomason. We find that issue one is without merit. However, issue two has merit; therefore, this Court reverses and remands the case for discovery.

FACTS
¶ 2. The Delta Democrat Times published an article regarding accusations of unethical conduct by Municipal Court Judge *1248 Michael Prewitt. This article was written by Maria Burnham, and contributed to by staff writer William F. West and editor Dan Way. The contributions by Dan Way are the basis of the claim of libel asserted by Griffin. Dan Way added the statement that "The Internal Affairs Division determined there was no evidence to conclude Wynn [sic] was a racist, as claimed by Moore, Councilman Larry Farmer and attorneys Eric Hawkins and Willie Griffin." At the time of this publication Griffin was not only an attorney, but he served as legal counsel for the Board of Supervisors of Washington County.
¶ 3. In response to this statement, Willie Griffin wrote a letter to Dan Way asserting that he had never called Judge Prewitt a racist and demanded a complete retraction. The Delta Democrat Times did not print a retraction of the statement. Thereafter, Griffin filed his complaint alleging libel on behalf of the Delta Democrat Times, Dan Way, and Rick Thomason.
¶ 4. Griffin immediately pursued discovery from all of the parties involved; however, each party refused to respond. Thereafter, the Delta Democrat Times, Dan Way, and Rick Thomason filed their motion for summary judgment and motion to stay discovery. The motion for summary judgment was granted without addressing the issue of discovery.

DISCUSSION

I. WHETHER THE TRIAL JUDGE ERRED WHEN HE CLASSIFIED GRIFFIN AS A PUBLIC OFFICIAL FOR THE PURPOSE OF HIS BURDEN OF PROOF REGARDING HIS LIBEL CLAIM.
¶ 5. Griffin argues that the trial judge erred when he classified him as a public official and held him to a higher standard for proving libel as stated in New York Times, Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Griffin contends that he should not be considered a public official for the purpose of this action because: (1) he was a private attorney with a governmental client (i.e., the Washington County Board of Supervisors) and (2) because the statement attributed to him in the Delta Democrat Times failed to reference his public capacity.
¶ 6. The Delta Democrat Times, Dan Way, and Rick Thomason contend that Griffin falls squarely within the definition of a public official and that the actual malice standard applies. Additionally, not only is Griffin a public official, but he also fits the definition of a public figure which also requires that Griffin prove his case by showing clearly convincing evidence of actual malice. Furthermore, they assert that regardless of Griffin's status, Mississippi applies an actual malice standard to matters of public concern or interest.
¶ 7. New York Times Co., 376 U.S. at 279-80, 84 S.Ct. 710, created the "actual malice" standard to apply to public officials in defamation cases. This coverage was later extended to cover public figures who did not hold a government office. See Curtis Publ'g Co. v. Butts, 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Chief Justice Warren defined a "public figure" as those individuals who are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." Id. at 164, 87 S.Ct. 1975.
¶ 8. In this case, we find that under the law Griffin is afforded no relief from having to prove actual malice regarding any libelous statement. This is due to the fact that even if this Court did not classify him as a public official, we determine that his involvement in this matter conforms to the definition of a "public figure." The issue of whether Judge Prewitt was unethical *1249 was a matter of public concern for Greenville, Mississippi residents, and Griffin voluntarily involved himself in the resolution of this matter. Accordingly, this issue is without merit.

II. WHETHER THE TRIAL JUDGE ERRED WHEN HE GRANTED THE MOTION FOR SUMMARY JUDGMENT WITHOUT GRIFFIN HAVING THE BENEFIT OF DISCOVERY REGARDING THE DELTA DEMOCRAT TIMES PUBLISHING COMPANY, DAN WAY, INDIVIDUALLY, AND RICK THOMASON, INDIVIDUALLY.
¶ 9. Griffin argues that the trial judge prematurely granted the motion for summary judgment filed by the Delta Democrat Times, Dan Way, individually, and Rick Thomason, individually, because it was granted before Griffin had the benefit of discovery from these parties. Griffin asserts that he served interrogatories for each party and made requests for the depositions of Dan Way and Rick Thomason, only to be met with refusal by these parties. Griffin primarily relies upon the United States Supreme Court case of Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), to support his argument.
¶ 10. The Delta Democrat Times, Dan Way, and Rick Thomason assert that the trial judge is vested with broad discretion to limit discovery and he was within those limits. Additionally, they argue that summary judgment was appropriate because Griffin failed to meet his burden of proof and show by clear and convincing evidence that the statement regarding him in the Delta Democrat Times was published with actual malice as required by New York Times Co., 376 U.S. at 279-80, 84 S.Ct. 710.
¶ 11. Since we have concluded that Griffin is governed by the actual malice standard in New York Times, when the trial judge reviewed the motion for summary judgment he was required to determine if the evidence before him would support a reasonable jury finding that Griffin had demonstrated actual malice with convincing clarity. However, before the trial judge examined this issue, he should have addressed the more introductory matter of whether summary judgment was premature because of the lack of discovery.
¶ 12. The Delta Democrat Times, Dan Way, and Rick Thomason assert that summary judgment was appropriate without additional discovery because the statement was not defamatory. The trial judge has previously addressed this issue in his order by stating that the written statement was inaccurate.
¶ 13. Griffin and Mayor Artman, whom Griffin initially consulted about Judge Prewitt, assert that Griffin was conveying the concerns of others and did not directly call Judge Prewitt a racist. On the other hand, the statement printed by the Delta Democrat Times asserted that Griffin claimed Judge Prewitt was a racist. On its face, this is not a true reflection of what Griffin had stated, and the difference was not insubstantial. See Blake v. Gannett Co., Inc., 529 So.2d 595, 602-03 (Miss.1988). Nevertheless, at this point in this case, the difference does not equate with liability. It must first be determined whether Griffin can show with convincing clarity that the statement was made with actual malice. For reasons discussed below, the determination of whether there is a jury question regarding the defamatory nature of the statement will have to be revisited by the court below.
¶ 14. "This Court may only reverse the trial judge's ruling regarding discovery if we find that there has been an abuse of discretion." Warren v. Sandoz Pharm. Corp., 783 So.2d 735, 738(¶ 5) (Miss.Ct. App.2000). To determine whether there *1250 has been an abuse we consider the language in Herbert v. Lando, 441 U.S. 153, 170, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).
¶ 15. Herbert v. Lando, was a defamation case brought by a public figure in which the United States Supreme Court addressed whether the First and Fourteenth Amendments should be construed to provide additional protection to the press when sued for defamation. Herbert, 441 U.S. at 155, 99 S.Ct. 1635. Lando was requesting that the United States Supreme Court hold as follows:
when a member of the press is alleged to have circulated damaging falsehoods and is sued for injury to the plaintiff's reputation, the plaintiff is barred from inquiring into the editorial processes of those responsible for the publication, even though the inquiry would produce evidence material to the proof of a critical element of his cause of action.
Id. The court declined to accept this request. Id. at 170, 99 S.Ct. 1635.
¶ 16. Instead, the United States Supreme Court held that the First Amendment afforded no such evidentiary privilege. Id. at 175, 99 S.Ct. 1635. Such a privilege was denied because it would substantially interfere with the ability of the individual who brought the defamation action to establish malice as required by New York Times. Id. at 170, 99 S.Ct. 1635. In a defamation action, the requirement of actual malice on the part of the author has nothing to do with any anger or ill feelings in the defamer's heart, but whether the statement was published with the knowledge that it was false or with reckless disregard for its veracity. 2 RODNEY SMOLLA, SMOLLA & NIMMER ON FREEDOM OF SPEECH § 23:3 (2000). Therefore, the plaintiff would be entitled to use discovery to inquire into the decision-making processes involved in a particular story. Id. In Herbert, the United States Supreme Court also addressed an issue of concern in our case regarding the possibility of self-serving statements by defendants involved in a defamation action. Herbert, 441 U.S. at 170, 99 S.Ct. 1635.
¶ 17. The United States Supreme Court acknowledged that rarely will a defendant admit his awareness of a falsehood. Id. Naturally, defendants will be prone to assert their good-faith belief in the truth of their publication, and if the plaintiff were denied discovery it would make it difficult to prove knowing or reckless falsehood with "convincing clarity." Id.
¶ 18. In this case, Griffin had the benefit of the deposition of Mayor Artman and affidavits from Dan Way and Rick Thomason. The deposition of Mayor Artman stated that Griffin had approached him to discuss allegations of racism regarding Judge Prewitt; however, Mayor Artman explained that these were not direct allegations made by Griffin. Instead, Griffin was merely conveying what he had heard from others. Mayor Artman also confirmed that he had spoken to Dan Way and had confirmed that the allegations of racism had started with Griffin. Additionally, as recognized by the United States Supreme Court in Herbert, after portions of the affidavit of Dan Way had been stricken it asserted that "the article was written and published in good faith to inform the Delta Democrat Time's readers about a matter of public concern." After portions of the affidavit of Rick Thomason were struck, it asserted that before the article in question had been published he had not reviewed it, had not been consulted about it, and was not aware of its existence. These statements do not allow Griffin knowledge of the subjective, editorial, decision-making process as contemplated by Herbert v. Lando. Therefore, Griffin was denied full discovery.
*1251 ¶ 19. Under the law the trial judge abused his discretion and prematurely granted the motion for summary judgment without Griffin having had the benefit of full discovery. Accordingly, this Court reverses and remands this case for Griffin to conduct discovery to explore the editorial, decision-making processes that were employed by the Delta Democrat Times, Dan Way and Rick Thomason.
¶ 20. THE JUDGMENT OF THE CIRCUIT COURT OF WASHINGTON COUNTY IS REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
McMILLIN, C.J., SOUTHWICK, P.J., BRIDGES, THOMAS, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR. IRVING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. KING, P.J., NOT PARTICIPATING.
IRVING, J., concurring in part, dissenting in part:
¶ 21. I agree with my brethren in the majority that this case should be reversed for the reasons stated in the majority opinion. However, I disagree with, and dissent from, that portion of the majority opinion which holds that Griffin, for purposes of resolution of the libel issue presented, is a public figure.
¶ 22. Griffin sued the Delta Democrat Times Publishing Company (Delta Democrat) and others over the publication of a statement which Griffin claims is false and defamatory. Griffin's singular involvement in the matter, which led to the publication of the statement, was his reporting to the Mayor of the City of Greenville the substance of comments made by some municipal court employees concerning rulings by the municipal court judge. Griffin is not an elected official but is the attorney for the Board of Supervisors.
¶ 23. The majority's holding that Griffin is a public figure is quite significant and imposes a serious evidentiary hurdle for Griffin because, if he is a public figure, he has to prove malice on the part of the Delta Democrat before he can recover for the libelous statement. I believe the facts in this case, as well as the applicable law, argue against the holding of the majority on the issue of Griffin's status.
¶ 24. The majority, relying on Curtis Publishing Co. v. Butts, Associated Press v. Walker, 388 U.S. 130, 154, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), holds that Griffin should be held to the high standard first enunciated by the Supreme Court in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In Sullivan, the Supreme Court held that a public official was required to show malice before he could recover damages in a defamation of character action against critics who made false statements in their criticism of his official conduct. Id. at 283, 84 S.Ct. 710. Three years after Sullivan, the Supreme Court, in the consolidated cases of Butts and Walker, was faced with the question of whether the malice standard enunciated in Sullivan applied to defamation actions "instituted by persons who are not public officials but who are public figures and involved in issues which the public has a justified and important interest." Id. at 134, 87 S.Ct. 1975. A very splintered Supreme Court extended the malice standard to public figures in a plurality opinion authored by Justice Harlan and three separate writings by Chief Justice Warren, Justice Black and Justice Brennan, respectively. Justice Harlan, Justice Clark, Justice Stewart and Justice Fortas thought the malice standard was too high and *1252 would hold that a person who is a public figure but not a public official "may recover damages for a defamatory falsehood ... on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." Curtis Publishing Co. v. Butts, Associated Press v. Walker, 388 U.S. at 155, 87 S.Ct. 1975. Chief Justice Warren, Justice Brennan and Justice White thought the New York Times standard was equally applicable to libel actions by public figures. Id. at 164, 173, 87 S.Ct. 1975. Justice Black and Justice Douglas thought that the First Amendment shielded the press from libel actions altogether and would abandon the standard adopted in New York Times. Id. at 172, 87 S.Ct. 1975.
¶ 25. Although the majority correctly points out that Butts and Walker require public figures to prove malice before recovering in defamation actions, I do not believe Butts and Walker provide support for the majority's conclusion that Griffin, on the facts presented in our case, should be treated as a public figure as was the case with the respondents in Butts and Walker.
¶ 26. In Butts, Wallace Butts sued Curtis Publishing Company for defamation of character over an article printed in the Saturday Evening Post, a publication owned by Curtis. At the time the article was written, Butts was the athletic director of the University of Georgia and had overall responsibility for the administration of its athletic program. Curtis Publ'g Co. v. Butts, Associated Press v. Walker, 388 U.S. at 135. However, he was employed by the Georgia Athletic Association, a private corporation, rather than by the State of Georgia. Id. The article accused Butts of providing the University of Alabama's coach with the offensive plays and defensive strategy that Georgia would employ in a game played between the two teams in 1962. Id. "Butts had previously served as head football coach of [Georgia] and was a well known and respected figure in coaching ranks." Id. at 135-36, 87 S.Ct. 1975.
¶ 27. In Walker, Edwin A. Walker sued the Associated Press for defamation over the distribution of a news dispatch of an article giving an eyewitness account of the massive riot that erupted on the University of Mississippi campus from federal efforts to enforce a court order to enroll James Meredith in that institution. Id. at 140, 87 S.Ct. 1975. Walker was a private citizen who had "pursued a long and honorable career in the United States Army before resigning to engage in political activity." Id. Walker "was acutely interested in the issue of physical federal intervention, and had made a number of strong statements against such action which had received wide publicity." Curtis Publ'g Co. v. Butts, Associated Press v. Walker, 388 U.S. at 140, 87 S.Ct. 1975. He had his own following known as the Friends of Walker and was a man of some political prominence. Id. The dispatch stated that Walker took command of the violent crowd and personally led a charge against the federal marshals. It also stated that Walker encouraged the rioters to use violence and gave them technical advice on combating the effect of tear gas. Id.
¶ 28. The Supreme Court, in concluding that Butts and Walker were public figures, stated:
We note that the public interest in the circulation of the materials here involved, and the publisher's interest in circulating them, is not less than that involved in New York Times. And both Butts and Walker commanded a substantial amount of independent public interest at the time of the publications; *1253 both in our opinion, would have been labeled "public figures", under ordinary tort rules.
Id. at 154, 87 S.Ct. 1975.
¶ 29. Griffin, as the attorney for the Board of Supervisors of Washington County, would probably be considered a public figure as to his involvement in any matters before the Board of Supervisors of Washington County, or as to any matters which, though not before the board, could reasonably be expected to involve board action at some point. As to any other matters, it appears to me that Griffin could not be considered a public figure unless he had, in a very visible and public manner, played a prominent role in a matter of great public interest. This, in my opinion, is the core teaching of Butts and Walker on the issue of non-elected persons who may be considered public figures in defamation actions.
¶ 30. "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." Wolston v. Reader's Digest Association, Inc., 443 U.S. 157, 167, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). The case of Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), illustrates this point. In Gertz, Elmer Gertz, a reputable attorney,[1] was hired by the family of a murder victim to represent them in civil litigation against the murderer, a Chicago policeman. Gertz, 418 U.S. at 325-26, 94 S.Ct. 2997. In his capacity as counsel for the family, Gertz attended the coroner's inquest into the victim's death and initiated actions for damages, but he neither discussed the matter with the press nor played any part in the criminal proceedings. Id. Notwithstanding Gertz's remote connection with the prosecution of the murderer, the American Opinion, a monthly outlet for the views of the John Birch Society, published an article entitled "Frame UP" in which it portrayed Gertz as the architect of a frame-up of Chicago policemen. Id. at 326, 94 S.Ct. 2997.
¶ 31. Gertz sued the owner of the American Opinion for defamation in the United States District Court for the Northern District of Illinois and obtained a $50,000 jury verdict which was subsequently set aside by the district court. Id. at 329, 94 S.Ct. 2997. On appeal, the Court of Appeals for the Seventh Circuit affirmed the decision of the district court because the court of appeals concluded that the New York Times standard applied to any publication or broadcast about an issue of significant public interest, without regard to the position, fame, or anonymity of the person defamed. Id. at 331, 94 S.Ct. 2997. The Supreme Court granted certiorari and reversed. In doing so, the Gertz court instructed:
Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution *1254 of the issues involved. In either event, they invite attention and comment.
Id. at 345, 94 S.Ct. 2997 (emphasis added).
¶ 32. In holding that Gertz was not a public figure, the Gertz court was particularly didactic with respect to the circumstances when a non-elected individual may be classified as a public figure for purposes of resolving defamation actions against entities interposing the First Amendment in defense of the publication alleged to be defamatory:
In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.
* * * * * *
We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes. Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.

Gertz, 418 U.S. at 351-52, 94 S.Ct. 2997 (emphasis added).
¶ 33. The matter leading to the libel action in our case does not involve any business of the Board of Supervisors of Washington County, nor does it involve any matter which may reasonably be expected to come before the board. It does not involve a matter that had garnered the public airways or any degree of public interest at the time Griffin made the statement to the Mayor of Greenville. This is clearly shown by Mayor Artman's deposition when he was asked about the statement which undergirds Griffin's libel action:
Q. If you would, share with me exactly what is the basis for that statement.
A. I was in office at some point, and I really don't know the date and have not tried to refresh my memory on the dates, I keep an open door, and this was not an appointment, but Mr. Griffin did come to see me.
Really, from the circumstance of fresh being from the municipal court and purporting to me about some information about that he had seen and heard some things at municipal court that were unsavory, something to the point of, as an officer of the court, he thought he should report that to me as the chief officer of the City of Greenville.
I assured him that I thought that was legitimate for him to bring that to me, that I appreciated it and probably reassured him several times that I would deal forthrightly with it. And I was very serious about doing that.
Q. Would you tell me what he reported that he heard.
A. That something to the effect that the employees and people in the office there were in somewhat of a turmoil about activities that had taken place at the court concerning the judge and activities of the court employees in relationship to the judge.
Q. Mayor Artman, to the degree that you can, can you be specific in what *1255 Mr. Griffin reported to you that these employees had said.
A. As I try to refresh that in my memory, it's--I do recall very vividly the office visit and the circumstances and because I had not heard any of this previously and it was almost as if something had happened in the last five minutes, last hour, and he was coming to report that to me. Later I found out that these were really conversations that were taking place around a counter or around a desk or something like that with a number of employees.
So that's the only thing that's in my mind that's in question. I thought this was something that had just happened.
Q. Okay.
A. So he was reporting more of what he had heard other employees saying or employees saying down there at the municipal court.
Q. Now, if you would sirand I appreciate your candor in helping with this-share with me what you recall that Mr. Griffin said to you that these other employees of or employees of the municipal court had said.
A. That there was some difficulty dealing with the judge based on race and this should be investigated, and I assured him I would do so.
Q. Did Mr. Griffin make any claim that the judge was a racist?
A. No, sir.
¶ 34. As previously observed and as shown by the colloquy above, no legitimate argument can be made that the matter concerning Judge Prewitt had become the focal point of a public controversy, much less to suggest that Griffin had thrust himself to the forefront of the matter in order to influence the resolution of the issues involved. Instead, the matter was being discussed privately by some municipal employees, and Griffin simply reported to the mayor what Griffin had heard. There is not one scintilla of evidence that Griffin did anything further after reporting the matter to the mayor. As previously noted and quoted above from the Wolston court, Griffin, "a private individual [was] not automatically transformed into a public figure just by becoming involved in or associated with a matter that [eventually attracted] public attention." Wolston, 443 U.S. at 167, 99 S.Ct. 2701. Therefore, I cannot agree that it is proper to classify Griffin as a public figure.
¶ 35. For the reasons presented, I concur in part and dissent in part.
NOTES
[1] In addition to being a reputable attorney, Gertz was well known in some circles; "[he had] long been active in community and professional affairs." He had "served as an officer of local civic groups and of various professional organizations, [and had] published several books and articles on legal subjects." Gertz, 418 U.S. at 351, 94 S.Ct. 2997.